# In the United States Court of Federal Claims

No. 13-223C
(Filed: August 13, 2013)*
**\*Opinion originally filed under seal on July 25, 2013**

* * * * * * * * * * * * * * * * * * * *

|  |  |  |
|---|---|---|
| | * | |
| ST NET, INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Post-award Bid Protest; Standing under 28 |
| | * | U.S.C. § 1491(b)(1); Interested Party; |
| THE UNITED STATES, | * | Substantial Chance of Award; |
| | * | Clarifications; Agency Discretion to |
| Defendant, | * | Exclude Offeror for Incomplete Proposal; |
| | * | Clerical Errors |
| and, | * | |
| | * | |
| WILDFLOWER INTERNATIONAL, | * | |
| LTD., | * | |
| | * | |
| Defendant-Intervenor. | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * *

*David B. Dempsey*, Reston, VA, for plaintiff.  *James C. Fontana*, Reston, VA, of counsel.

*David A. Levitt*, Civil Division, U.S. Department of Justice, Washington, DC, with whom were *Stuart F. Delery*, Acting Assistant Attorney General, and *Jeannne E. Davidson,* Director, Commercial Litigation Branch, for defendant.  *Peter Hartman*, Office of General Counsel, Department of Homeland Security, Washington, DC, of counsel.

*Lars E. Anderson*, Tysons Corner, VA, for defendant-intervenor.  *James Y. Boland* and *Christina K. Kube*, Tysons Corner, VA, of counsel.


**O P I N I O N**


**FIRESTONE**, *Judge*

In this post-award bid-protest case, ST Net, Inc. ("the plaintiff" or "ST Net") alleges that the Department of Homeland Security ("DHS") abused its discretion and violated various provisions of the Federal Acquisition Regulation ("FAR") by disqualifying ST Net's proposal from consideration for an award under the FirstSource II Indefinite Delivery, Indefinite Quantity ("IDIQ") solicitation.[1]  The plaintiff contends that because ST Net submitted a Sample Delivery Order Pricing Matrix ("pricing matrix") that contained two * * * mistakes, DHS was obligated to afford ST Net an opportunity to correct those mistakes through either clarifications or discussions prior to disqualifying ST Net from award.  The United States ("the government" or "the defendant") has moved to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC") and the parties have cross-moved for judgment on the administrative record pursuant to RCFC 52.1(c).  For the reasons that follow, the court finds that ST Net has stated a claim for relief and has standing to challenge the government's discretionary decision to disqualify ST Net; therefore the government's motion to dismiss is **DENIED**.  However, because the court also concludes that DHS's decision to disqualify ST Net's concededly incomplete proposal was lawful and rationally supported, the government's motion for judgment on the administrative record is **GRANTED**, and the plaintiff's cross-motion is **DENIED**.

---

[1] As discussed below, this protest does not involve the award of any particular delivery order under the FirstSource II vehicle.  Rather, the plaintiff challenges its non-award of a FirstSource II IDIQ contract.  Without an IDIQ contract, ST Net cannot bid on any of the delivery orders that DHS intends to issue under FirstSource II.  On April 3, 2013, the government agreed to forbear undertaking additional FirstSource II funding or procurement activity for those small business categories applicable to ST Net for four months.  See Scheduling Order, ECF No. 17.

I.     **BACKGROUND**[2]

**A.  The FirstSource II solicitation**

On December 27, 2011, DHS posted Solicitation No. HSHQDC-12-R-00005 ("FirstSource II"), which was designed as a five-year follow-on to the competitively awarded suite of IDIQ contracts under FirstSource I.  AR 2.  FirstSource I, awarded in 2007, facilitated streamlined purchase, delivery, and installation of IT commodity products and solutions by DHS.  AR 12.  In a similar vein, the stated objective of FirstSource II, which has a total cost-ceiling of $3 billion, is "to establish contracts with experienced Information Technology Value-Added Resellers to provide a variety of commercially-available IT commodities, solutions, and value-added reseller services to support DHS programs . . . ." AR 2, 9.

Under the solicitation, offerors sought FirstSource II IDIQ contracts in one or more of the following small business set-aside categories: 8(a); Historically Underutilized Business Zone ("HUBZone"); Service-Disabled, Veteran-Owned Small Business ("SDVOSB"); (4) Economically Disadvantaged, Women-Owned Small Business ("EDWOSB"); and (5) Small Business.  AR 2.  IDIQ awardees are guaranteed a minimum of $250 and, with certain exceptions, the fair opportunity to bid on subsequent delivery orders.  AR 8, 31.  Competition for each FirstSource II delivery order is to be limited, however, to only a single small business category.  AR 31.  For example, should DHS decide to limit a particular delivery order to the SDVOSB category, then only

---

[2] Unless otherwise stated, these facts are undisputed and are taken from the complaint, exhibits to the parties' moving papers, and the Administrative Record ("AR").

contractors who received a FirstSource II IDIQ contract in the SDVOSB category will be eligible to compete for that delivery order.  AR 31.

The FirstSource II solicitation stated that the IDIQ contracts would be awarded under FAR Part 12 (Acquisition of Commercial Items) using the procedures of FAR Part 15 (Contracting by Negotiation).  DHS planned to award IDIQ contracts in a best value source selection to responsible offerors "whose offer(s) conforming to the solicitation [were found to] be most advantageous to the Government, price and other factors considered."  AR 83.  DHS planned to conduct separate source selections for each small business category, making a sufficient number of awards in each category to ensure adequate competition at the delivery order level.  The non-price factors included (1) Corporate Experience, (2) Ability to Achieve Results, and (3) Past Performance.  AR 83. Price, which was not to be assigned an adjectival rating, was less important than the combined non-price factors.

DHS planned to calculate a "total evaluated price" as the "total price for the items and labor rates/hours set forth in the Sample Delivery Order Pricing Matrix."  AR 83. This pricing matrix consisted of a DHS-provided Microsoft Excel workbook that listed "the types of IT commodities and services that DHS has procured in the past."  AR 300. For supplies, the matrix listed approximately 70 types of information technology equipment for which bidders were required to provide (1) brand/model names, (2) ceiling prices, and (3) discount rates.[3]  AR 300 (sample Pricing Matrix instruction page stating

---

[3] DHS "locked" the vast majority of the pricing matrix, thereby preventing offerors from manipulating cells other than those calling for pricing, brand/model name, or discount rate

that "[a]ll items and options must be priced"); AR 317-18 (listing 70 line items).  Based

on data provided by the offeror on these inputs, the spreadsheet automatically calculated

price information to be used by the evaluators.[4]  The completed pricing matrix constituted

an offeror's price volume.

The instructions to the pricing matrix explained that offerors could be held to the

prices for specific items listed in their matrices when bidding on subsequent delivery

orders:

> The quotes proposed by Offerors through this matrix will be designated as
> ceiling prices/rates for any future orders made under the FirstSource II
> vehicle. . . . The ceilings being set through the price proposals for IT items
> are only in connection with the specific "Brand/Model" proposed by the
> Offeror AND the exact minimum configurations being sought at this time
> through Attachment 5.  Once again, the prices/quotes proposed herein are
> established as ceiling prices for the [specific] items proposed AND the
> minimum configurations being sought.  Competition at the IDIQ level will
> ultimately decide the best value to the Government. . . . For supplies—the
> ceiling prices are based on both the minimum requirements/specifications
> in the document AND the brand/model proposed by an Offeror.  (Two
> things which are likely to change and vary throughout the life of the
> contract) . . . . When certain specifications or proposed items (brand and
> model) become obsolete, the established ceiling will carry no weight.  The
> IDIQ level competitions will establish a new market price.

---

information.  DHS yellow-highlighted all of the cells for which pricing data was required in
order to aid contractors in identifying each of the items and options that were to be priced.  See
AR 296.

[4] In reviewing these pricing matrices, the court notes that the last worksheet in the pricing matrix,
titled "Summary," provided anyone reviewing the matrix with a concise—and automatically
populated—list of the brand/model proposed by the offeror for each line item.  See AR 317-18.
Thus, if a bidder failed to insert brand/model information into the appropriate cell, the absence of
that information would be readily apparent by a cursory review of the Summary worksheet.  See
AR Tab 39 (ST Net Pricing Matrix in Native Format).

AR 300.  The solicitation further provided that "[t]he evaluation of the information

provided in the Sample Delivery Order Pricing matrix [would] include accuracy,

completeness, and reasonableness. . . . and the Government will use all the information

provided in its evaluation."[5]  AR 254.

Although DHS elected to use the acquisition procedures found in FAR Part 15,

the solicitation made clear that the government, in accordance with 48 C.F.R. § 15.306,[6]

intended to make its award based solely on the offerors' proposals and did not intend to

engage in discussions.  See AR 71, 82 ("The Government intends to evaluate offers and

award a contract without discussions with offerors.  Therefore, the offeror's initial offer

should contain the offeror's best terms from a price and technical standpoint.").

---

[5] Under the Source Selection Plan, the Contracting Officer ("CO") was ultimately responsible for reviewing proposals to ensure that the evaluation documentation was complete, accurate, and consistent.  AR 364.

[6] FAR 15.306 provides, in part:

(a) Clarifications and award without discussions.

(1) Clarifications are limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated.

(2) If award will be made without conducting discussions, offerors may be given the opportunity to clarify certain aspects of proposals (e.g., the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond) or to resolve minor or clerical errors.

(3) Award may be made without discussions if the solicitation states that the Government intends to evaluate proposals and make award without discussions.  If the solicitation contains such a notice and the Government determines it is necessary to conduct discussions, the rationale for doing so shall be documented in the contract file . . . .

48 C.F.R. § 15.306.

Although the government reserved the right to "waive informalities and minor irregularities," AR 71, the solicitation repeatedly warned offerors that failure to conform to the solicitation's instructions jeopardized their chances of receiving an award.  Both the solicitation and DHS's responses to vendor questions emphasized the importance of providing complete and accurate information in order to be considered for award.  See, e.g., AR 3 ("DHS anticipates a significant level of competition for FirstSource II.  We strongly encourage interested companies to thoroughly read the evaluation criteria in this RFP prior to preparing a proposal."); AR 82 ("Each Offeror is responsible for ensuring that the information provided is thorough, accurate, and complete."); AR 124 ("The instructions provided have been . . . . designed to ensure the submission of information essential to the understanding and comprehensive validation and evaluation of proposals.  Clarity and completeness are of utmost importance to the proposal."); AR 128 ("The evaluation of the information provided in the Sample Delivery Order Pricing matrix will include accuracy, completeness, and reasonableness."); AR 226 (warning offerors that they "are required to submit proposal responses for all of the products and services set forth in [the pricing matrix]," in response to a vendor request to submit pricing for only some portions of the pricing matrix).

Finally, solicitation ¶ E.2.9(2), in a section titled, "Supplemental Instructions for Proposal Preparation," stated:

> Offerors are expected to follow the detailed proposal preparation instructions fully and carefully. The Government will rely substantially on the information provided by the Offerors to evaluate the proposals.  It is therefore imperative that Offerors carefully follow the instructions set forth below and submit their proposals in the format and with the content

specified below, providing all requested information.  Offers that simply restate the RFP requirements or that state that the Offeror's proposal is compliant with the requirements of the RFP—without providing necessary explanation or other data—are not likely to be highly evaluated, if they can be evaluated at all.  <u>Proposals that fail to provide all required information in the format requested may be found unacceptable and may be rejected without further consideration if the Contracting Officer determines that a significant revision or addendum to the Offeror's proposal would be required to permit further evaluation, and especially if the incompleteness of the proposal or errant formatting of the proposal appears to be due from a lack of diligence or competence of the Offeror.</u>

 AR 76-77 (emphasis supplied).

## B.  ST Net's proposal

ST Net timely submitted proposals for the general small business, EDWOSB, and 8(a) small business categories.  AR 597, 754, 882.  ST Net failed, however, to populate the Brand/Model, Unit Price, or Discount Rate information for two line items: * * * and * * *.[7]

* * *

<u>Id.</u>  Had the missing price information been included, ST Net asserts that its total evaluated price of approximately * * * would have increased by over * * *, to * * *.  <u>See</u> Pl.'s Reply 9 (citing Pl.'s Reply Ex. 7 at *13-14).

## C.  FirstSource II evaluation and award

By the time bidding closed in March 2012, DHS had received over 240 proposals from more than 140 bidders across the five small business categories.  AR 781.  Specifically, 47 companies submitted proposals for the 8(a) small business category, 37

---

[7] Although the solicitation was amended four times, it is undisputed that the solicitation * * *.

companies submitted proposals in the EDWOSB small business category, and 105

companies submitted proposals in the general small business category.[8]  AR 378, 669,

781.  These proposals were evaluated by a Technical Evaluation Panel ("TEP"), which

established the technical ratings for Corporate Experience, Ability to Achieve Results,

and Past Performance.  Proposals were also evaluated by a separate Price Evaluation

Team ("PET"), which conducted "independent evaluations of the Offerors' price

proposals in accordance with the information and guidance contained in the solicitation

and the [Source Selection Plan]."  AR 357.

Within each small business category, multiple proposals were removed from best

value consideration because their pricing matrices did not conform to the solicitation's

instructions.  For example, of the 105 companies that submitted proposals in the general

small business category, 9 companies submitted pricing matrices that were so inadequate

that the government could not calculate a total evaluated price.  AR 389.  Although DHS

conducted a price evaluation for the remaining proposals, the CO nevertheless removed

an additional 39 companies from best value consideration because their pricing matrices

failed to include brand/model and/or price information for each line item.  AR 645-48.[9]

---

[8] Although 106 offerors submitted proposals to the general small business category, one of the
proposals was withdrawn prior to the source selection decision.  AR 378, 950.

[9] For the 8(a) category, the pricing matrices of 7 companies were so inadequate that the
government could not calculate a total evaluated price.  AR 792.  An additional 18 companies
(including ST Net) for which DHS conducted price and technical evaluations were nevertheless
found to be "fundamentally flawed" and disqualified from consideration due to incomplete
information in their pricing matrices.  AR 905-06, 913.  For the EDWOSB category, the pricing
matrices of two companies were so inadequate that the government could not calculate a total
evaluated price.  AR 677.  At least 17 additional companies for which DHS conducted price and
technical evaluations were similarly disqualified from consideration due to incomplete

These proposals were deemed to be "fundamentally flawed" and were eliminated from consideration.  See AR 597.

The CO prepared a best value recommendation document for each small business category for use by the Source Selection Authority ("SSA") in making awards.  See AR 377, 668, 780.  ST Net's Technical proposal was ranked * * * in the general small business category, * * * in the EDWOSB category, and * * * in the 8(a) category.  AR 386, 676, 791.  ST Net's evaluated total price of * * * was ranked * * * in the general small business category, * * * in the EDWOSB category, and * * * in the 8(a) category.[10] AR 391, 678, 792.  Nevertheless, in her Best Value Recommendation Documents, the CO concluded that ST Net's price proposals were fundamentally flawed because ST Net had failed to conform to the solicitation's requirements.  See, e.g., AR 597.  Specifically, the CO wrote that ST Net's pricing matrix "did not provide Brand Names and Models, or quotes, for all of the supplies/items within their Sample Delivery Order Pricing Matrix as required by Attachment 5 of the solicitation.  This is a fundamental flaw of the proposal." Id.  As a consequence, ST Net was not recommended for an award in any of the small business categories.

On September 28, 2012, the SSA selected eight vendors for awards in the 8(a) small business category.  AR 915.  On December 21, 2012 the SSA selected five vendors

_____

information in their pricing matrices.  AR 771-72 (one company, * * *, appears to have submitted two non-conforming proposals).

[10] The record does not reflect the basis for the PET's conclusion that it was possible to calculate total evaluated prices for some, but not all, of the offerors who submitted incomplete pricing matrices.

for award in the EDWOSB category, AR 924, and fourteen vendors for award in the

general small business category.  AR 932.  In the Source Selection Decision Documents,

the SSA noted that multiple offerors' price proposals had been found to be

"fundamentally flawed" because the companies had failed to conform to the solicitation's

requirements.  See, e.g., AR 917-18, 926-27, 936-37.  Specifically, the SSA wrote:

> These Offerors did not provide brand names, model numbers, or quotes for
> some or all of the items bid.  The requirement to provide brand names and
> model numbers for all items bid was set forth in the Sample Delivery Order
> Pricing Matrix, and the FirstSource II solicitation (Chapter E, Part 2.9)
> indicated that if all required information was not provided in the requested
> format, the Offeror might be found to be unacceptable and rejected without
> further consideration.  This issue was also addressed/emphasized in the
> Government's responses to vendor questions (page 26) on the FirstSource
> II solicitation, which were posted to www.fbo.gov. . . .  Offerors whose
> price proposals included fundamental flaws (ST Net . . . ) did not adhere to
> the terms and conditions of the solicitation, and will not be considered for
> an award.

AR 917-18.[11]

---

[11] On page 26 of the referenced solicitation documents, one vendor had asked: "Can [a] small
business bid on a subset of the requirements? For example, we would like to compete for the
server business?"  AR 228.  In response, the government replied:

> No.  As stated in E.2.9(2), "Proposals that fail to provide all required information
> in the format requested may be found unacceptable and may be rejected without
> further consideration if the Contracting Officer determines that significant
> revision or [addendum] to the offeror's proposal would be required to permit
> [further] evaluation, and especially if the incompleteness of the proposal or errant
> formatting of the proposal appears to be due from a lack of diligence or
> competence of the Offeror[.]"

Id.

### D.  The instant litigation

On January 22, 2013, ST Net filed a protest with the United States Government Accountability Office ("GAO").[12]  See Def.'s Mot. Appx. A1-A2.  The protest challenged DHS's evaluation of ST Net's proposals in the 8(a), EDWOSB, and general small business categories.  Id.  GAO dismissed the 8(a) protest as untimely on March 4, 2013, and dismissed the remaining challenges the following day because ST Net failed to timely file comments on the agency report.  Id. at A4.

ST Net filed suit in this court on March 29, 2013, seeking, inter alia, a temporary restraining order ("TRO") and an injunction to prevent DHS from awarding any FirstSource II delivery orders within the 8(a), EDWOSB, or general small business categories until ST Net is awarded an IDIQ contract for those small business categories. Because the government agreed to forbear undertaking additional FirstSource II funding or procurement activity for those small business categories applicable to ST Net for four months, in April 2013 this court denied the plaintiff's application for a TRO.  See Scheduling Order, ECF No. 17.  Following briefing from ST Net, the court granted Wildflower International, Ltd.'s motion to intervene on April 15, 2013.[13]  See Order,

---

[12] The parties dispute when DHS notified the plaintiff of the basis for concluding that ST Net's pricing proposal contained a "fundamental flaw."  See Pl.'s Mot. 15 n.9 ("ST Net did not know the relevant details . . . until it received the Agency Report regarding its GAO bid protest on February 21, 2013.").  It is not necessary for the court to resolve this dispute because, as discussed below, the record demonstrates that it was rational for DHS to require offerors to include all requested price information, and ST Net admitted to having failed to provide price information for two of the 70 line items in the "Supplies" worksheet of the pricing matrix.

[13] On May 8, 2013 Wildflower filed notice of concurrence with the government's motions, and informed the court that it declined to submit a separate motion for judgment.  See Notice, ECF No. 32.

ECF No. 23.  Briefing on the government's motion to dismiss and the parties' cross-motions for judgment on the administrative record was completed on June 26, 2013, and oral argument was heard on July 19, 2013.

## II.   DISCUSSION

### A.  The government's motion to dismiss under RCFC 12(b)(1)

#### 1.   Standard of review for a motion to dismiss for lack of standing

The Tucker Act vests this court with jurisdiction "to render judgment on an action by an interested party objecting to . . . a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1) (2012).  Although the court will accept the plaintiff's well-pleaded factual allegations and draw all reasonable inferences in its favor, the plaintiff ultimately bears the burden of establishing that it is an interested party within the meaning of the statute.  See Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307-08 (Fed. Cir. 2006).  The plaintiff satisfies this burden by demonstrating that it was an "actual or prospective bidder whose direct economic interest would be affected by the award of the contract."  Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013).  In other words, the plaintiff must show that, but for a significant and prejudicial error in the procurement process, the plaintiff would have had a "substantial chance" of winning the contract (i.e., it would have been in the zone of active consideration).  See id.; Comint Sys. Corp. v. United States, 700 F.3d 1377, 1383 (Fed. Cir. 2012); Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378-79 (Fed. Cir. 2009); Preferred Sys. Solutions, Inc. v. United States, 110 Fed. Cl. 48, 56-58 (2013)

(citing cases).  Although "the mere timely submission of a proposal, no matter how defective," does not automatically confer standing, <u>Orion</u>, 704 F.3d at 1349, "a bidder has standing to challenge the lawfulness of discretionary acts that operate to exclude the bidder from consideration in cases where the bidder's ratings are such that had the government acted lawfully the bidder would have had a substantial chance of winning the contract," <u>G4S Tech. CW LLC v. United States</u>, 109 Fed. Cl. 708, 719 (2013).

### 2.   ST Net has standing to challenge its exclusion from award consideration

The government argues that ST Net lacks standing because its proposal was "fundamentally flawed" due to missing price and brand name information for two line items in its pricing matrix.  Viewing these omissions as material, the government asserts that ST Net could not have cured its proposal through "clarifications" within the scope of FAR 15.306(a)(2), but instead required discussions.  The government's standing argument thus depends on the fact that the FirstSource II solicitation clearly stated that the award would be made without discussions, and no discussions were ever conducted. Def.'s Mot. 17; Def.'s Reply 5.  Put simply, the government argues that ST Net is effectively stuck with its non-conforming proposal which, being non-conforming, could never have had a "substantial chance" of receiving an award.[14]  <u>See</u> Def.'s Mot. 14-17 (quoting dicta in <u>Orion</u>, 704 F.3d at 1349); Def.'s Reply 3.  The government further contends that, to the extent that ¶ E.2.9(2) of the solicitation required the CO to make a

---

[14] The government similarly argues that the complaint must be dismissed under RCFC 12(b)(6), on the grounds that, if the plaintiff was not eligible for award, the plaintiff cannot state a claim for relief premised on a challenge to that award.

formal determination prior to rejecting an incomplete bid, ¶ E.2.9(2) did not apply because ST Net was rejected <u>after</u> having been fully evaluated.  Def.'s Reply 13.

The plaintiff counters that ST Net has standing to challenge DHS's decision to reject ST Net's proposals as "fundamentally flawed."  This argument is premised on the plaintiff's contentions that DHS's rejection of ST Net's proposals was contrary to (1) FAR 1.602-2(b)[15] and 15.306, which the plaintiff asserts create an affirmative duty for DHS to allow for correction of suspected mistakes, Pl.'s Mot. 10-11, 16; and (2) the solicitation's purported requirement that the CO first determine, prior to rejecting an offeror's bid, that a significant proposal revision would be required to permit further evaluation.  Pl.'s Mot. 10.[16]  But for these errors, the plaintiff concludes, ST Net would have had a "substantial chance" of being awarded IDIQ contracts in each of the three small business categories in which it submitted proposals.  Pl.'s Mot. 4.

Although the question is close, the court agrees with the plaintiff.  Under the terms of the solicitation, DHS had discretion to reject proposals that "fail[ed] to provide all required information in the format requested," where "the Contracting Officer determine[d] that a significant revision or addendum to the Offeror's proposal would be required to permit further evaluation."  AR 76-77.  In this case, DHS first exercised that discretion when it eliminated 18 proposals (across the three relevant small business categories) because the offerors failed to adhere to the solicitation's requirements "to

---

[15] Under FAR 1.602-2(b), a contracting officer is responsible for ensuring "that contractors receive impartial, fair, and equitable treatment."  48 C.F.R 1.602-2.

[16] The plaintiff also contends that the failure to provide an adequate explanation to the contracting file is unreasonable within the meaning of FAR 1.602-2(b).  Pl.'s Mot. 10.

such an extent that a total evaluated price could not be calculated."  See, e.g., AR 793.

ST Net was not one of these 18 proposals—in fact, the PET calculated a total evaluated

price for ST Net despite the absence from ST Net's pricing matrix of two of the roughly

70 line items.  Only later did the CO and the SSA determine that ST Net's incomplete

pricing matrix was fundamentally flawed.[17]

Where, as here, the plaintiff alleges that DHS violated the solicitation's terms by

disqualifying ST Net's otherwise highly-rated proposal due to omissions that did not

constitute fundamental flaws, the plaintiff has standing to challenge its disqualification as

contrary to law, arbitrary, capricious, or an abuse of discretion.  See Orion, 704 F.3d at

1349 (criticality of missing information is "relevant to the reasonableness of the

[agency's] decision-making, not to determining prejudice for standing purposes"); MVS

USA, Inc. v. United States, No. 13-246C, 2013 WL 3329004, at *6 (Fed. Cl. June 27,

2013) (protester alleging that the disqualifying flaw in its proposal was due to improper

government action had standing to challenge award); Castle-Rose, Inc. v. United States,

99 Fed. Cl. 517, 523 (2011) (protester pleading sufficient facts to raise a question as to

whether government properly deemed its proposal late had standing to challenge award).

Clearly, if DHS was obligated to allow ST Net an opportunity to address minor

irregularities through clarifications and the information missing from ST Net's proposal

---

[17] The court also rejects the government's contention that solicitation ¶ E.2.9(2) "was
inapplicable because all proposals in this procurement were fully evaluated."  Def.'s Reply 13.
In explaining why ST Net's bid was eliminated from consideration, the SSA stated that "the
FirstSource II solicitation (Chapter E, Part 2.9) indicated that if all required information was not
provided in the requested format, the Offeror might be found to be unacceptable and rejected
without further consideration."  AR 917-18.  Thus, ¶ E.2.9(2) was the very basis for ST Net's
rejection.

could not reasonably be characterized as "fundamental," ST Net's highly-rated proposal should not have been eliminated from consideration and ST Net would have been in the zone of active consideration for award.  For this reason, the government's motion to dismiss under RCFC 12(b)(1) for lack of standing is **DENIED**.[18]

### B.  The parties' cross-motions for judgment on the administrative record

#### 1.   Standard of review for a motion for judgment on the administrative record

The court now turns to whether DHS's decision to disqualify ST Net based on the absence of price and brand/model name for two of the line items in ST Net's pricing matrix was contrary to law, arbitrary, capricious or an abuse of discretion.  In answering this question, the court applies the standard of review defined by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(A) (2012).  Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004); Impresa Construzioni Geom Domenico Garufi v. United States, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001).  To prevail on a motion for judgment on the administrative record, a plaintiff must show that either "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009).  The court will reject a challenge premised on the first

---

[18] It is for this same reason that the government's motion to dismiss for failure to state a claim must be denied.  Assuming, as the court must, that DHS's decision to eliminate ST Net from consideration based on the alleged minor mistakes was in error, ST Net has stated a claim for relief.

ground if "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." Axiom, 564 F.3d at 1381. Such decisions must be upheld even if, as an original proposition, the court might have exercised discretion in a manner different from the agency. See Weeks Marine, 575 F.3d at 1371. This deferential standard reflects the substantial latitude afforded to agency officials "to determine which proposal represents the best value for the government." E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, No. 2012-5125, 2013 WL 3185536, at *4, 7 (Fed. Cir. June 25, 2013). A challenge brought on the second ground must be denied unless the plaintiff shows "a clear and prejudicial violation of applicable statutes or regulations." Impresa Construzioni, 238 F.3d at 1333. Finally, to the extent that there are disputed issues of material fact, the court may, under RCFC 52.1, make factual findings "from the record evidence as if it were conducting a trial on the record." Bannum, Inc. v. United States, 404 F.3d 1346, 1354, 1357 (Fed. Cir. 2005).

### 2. DHS's decision to exclude ST Net from consideration was not arbitrary, capricious, an abuse of discretion, or contrary to law

Although ST Net makes several arguments contending that it was improper for DHS to disqualify ST Net from a FirstSource II IDIQ contract award on the grounds that it was "fundamentally flawed," this case can be distilled to just two issues: Whether DHS violated FAR 1.602-2(b) and 15.306[19] and abused its discretion by (1) declining to

---

[19] See supra note 6 (FAR 15.306(a)(2) grants discretion to agencies to allow offerors to clarify proposals or "resolve minor or clerical errors").

provide the plaintiff with notice and an opportunity to cure the omitted information in its pricing matrix prior to disqualifying ST Net's proposals, and (2) failing to adequately document the basis for disqualifying ST Net's proposal.

### i.   DHS's decision not to seek a clarification was not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law

The plaintiff first contends that, because of the obvious and "minor" nature of the omissions or mistakes in ST Net's pricing proposal, coupled with what ST Net believes was the ability to address those mistakes "without prejudice to any offeror and to the government's benefit," DHS had an affirmative duty to communicate with ST Net and provide an opportunity to revise its bid prior to disqualification.  See Pl.'s Reply 6-9.  In support of this proposition, the plaintiff relies chiefly on FAR 1.602-2(b) (contracting officers have a duty to act fairly with offerors) and 15.306(a)(2) (permitting clarifications to address minor or clerical errors prior to establishment of a competitive range or award without creation of a competitive range).  ST Net also cites several cases in which courts have found that the government has a duty to notify bidders of potential mistakes when the agency knows or should know about the error.  See Pl.'s Mot. 17; Pl.'s Reply 6 n.8.

In response, the government characterizes the plaintiff's argument as an attack on DHS's decision to reject all incomplete proposals, which the government contends is not reviewable.  Def.'s Reply 12-13 (quoting E.W. Bliss, 77 F.3d at 449).  The government further notes that the cases on which ST Net relies are inapposite because all of them involve a contracting officer's duty to seek clarification of conforming bids.  Def.'s Mot. 22-23.

The court finds for the reasons that follow that DHS did not have an affirmative duty to provide ST Net with an opportunity to correct or revise its bid through clarifications prior to disqualification and that DHS's decision not to seek any clarifications was not arbitrary, capricious or an abuse of discretion.  As discussed above, it is undisputed that ST Net failed to fill in the price and brand/model information for two line items.  Instead, ST Net listed the brand/model name for both items as * * *," which ST Net acknowledges was an error.  ST Net included a price and discount rate for both items at * * *, which was also an error.  ST Net concedes that if DHS had provided an opportunity for the plaintiff to remedy its proposal, ST Net's total evaluated price would have been increased by over * * *, from * * * to * * *.

The court cannot say, based on this record, that ST Net's errors were minor or clerical such that DHS's failure to seek a clarification can be characterized as arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.  Importantly, the price, brand/model information, and discount rates were not simply estimating tools, but were actually binding on the offerors—at least until "certain specifications or proposed items (brand and model) [became] obsolete."  AR 5.  By its own estimate, ST Net's errors would have amounted to a roughly 7% increase in ST Net's total evaluated price.  Moreover, ST Net's contention that the government might have ascertained the missing brand information from elsewhere in ST Net's proposal is severely undermined by the plaintiff's concession that multiple bidders offered different brand items for the

line items at issue in this case.[20]  Pl.'s Mot. 16 (estimating that "approximately * * * % of

the offerors whose price matrices the Government provided in the Administrative Record

* * * offered the same item for Line Items * * *.  Indeed, this court has held that an

agency is not required to sift through a proposal in order to identify information that the

offeror failed to include in the correct place.  See IBM Corp. v. United States, 101 Fed.

Cl. 746, 758-59 (2011).  In light of the undisputed facts, the court rejects ST Net's

contention that ST Net's omissions were simply minor or clerical, or that it was improper

for DHS to abstain from requesting that ST Net address these errors through

clarifications.

     The court has examined the cases on which the plaintiff relies and finds that none

address the issue in the case at bar: Whether an agency, when conducting a negotiated

procurement under FAR Part 15 that expressly contemplates making an award(s) without

discussions or creation of a competitive range, is under an affirmative duty to allow an

offeror to cure a material omission in its proposal.  Indeed, most of the plaintiff's cited

cases rely on a "duty to inquire" found in FAR Part 14, which applies to sealed bidding,

rather than negotiated procurements.  See Hunt Constr. Co. v. United States, 281 F.3d

1369, 1374-75 (Fed. Cir. 2002) (discussing duty to verify bids under FAR Part 14);

Giesler v. United States, 232 F.3d 864, 869 (Fed. Cir. 2000) (recognizing duty to examine

under FAR Part 14); Ruggierio v. United States, 190 Ct. Cl. 327, 329, 334-39,  (1970)

---

[20] Essentially, ST Net argues that DHS should have inferred the identity of the missing
brand/model information for line items * * *.

(contracting officer erred by accepting bids that he should have known were mistaken

prior to acceptance)).[21]

In addition, the plaintiff's reliance on Griffy's Landscape Maint. LLC v. United

States, 46 Fed. Cl. 257, 259-60 (2000) (duty to seek clarification for clerical errors

applies in both sealed and negotiated procurements), which did involve a FAR Part 15

procurement, is misplaced.  Unlike the instant case, in which the plaintiff omitted

material terms in the form of price and brand/model name, the plaintiff in Griffy's made

only a clerical error by neglecting to include the point of contact information for the

company's insurer.  Id.  Even putting aside the subsequent criticism of its holding, see,

e.g., C.W. Over & Sons, Inc. v. United States, 54 Fed. Cl. 514, 521 n.10 ("Since the

contract at hand was the result of a negotiated procurement process, its administration is

governed only by the provisions in part 15."), Griffy's simply does not stand for the

---

[21] The plaintiff also relies heavily on Matter of CH2M Hill Antarctic Support, Inc., B-406325, 2012 CPD ¶ 142 (Comp. Gen. April 18, 2012), for the proposition that an agency may allow for the correction of a mistake through clarifications, rather than discussions.  Pl.'s Mot. 5 n.1; Pl.'s Reply 9-10.  The agency in CH2M had requested, prior to awarding the contract, that the eventual awardee confirm the accuracy of the agency's resolution of a discrepancy in the number of hours that the offeror proposed in two different sections of its price volume.  See CH2M, B-406325, at *2, 8.  Over the protester's objection, the Comptroller General found that the communication constituted a clarification, rather than a discussion.  Id.

Although the court recognizes that decisions of the Comptroller General are instructive, CH2M is distinguishable from the present case.  Unlike the offeror in CH2M, ST Net never proposed any price or brand name information for the two line items at issue in this case.  Curing ST Net's proposal likely would have required supplementing its proposal with new and essential terms that had never formed a part of ST Net's original proposal.  This reality is not changed merely because the plaintiff has alleged that the agency might have inferred the intended price or brand name data based on information that the plaintiff submitted for different line items elsewhere in its pricing matrix.  As discussed, it was not arbitrary, capricious, an abuse of discretion, or contrary to law for DHS to have declined to make such inferences, and to have instead concluded that the absence of this information constituted a fundamental flaw.

proposition that in the absence of discussions, a contracting officer is under an affirmative duty to provide a bidder in a negotiated procurement with notice and an opportunity to correct material omissions in their proposals.[22]

   To hold that DHS could not disqualify ST Net without first allowing ST Net to correct its mistake and revise its proposal would significantly limit the discretion afforded to contracting officers in negotiated procurements under Section 15.306, which provides that "[c]larifications . . . may occur when award without discussions is contemplated."  48 C.F.R. § 15.306 (emphasis added).  This court has repeatedly recognized the permissive nature of this regulation in the context of negotiated procurements.  See, e.g., Mil-Mar Century Corp. v. United States, No. 13-131C, 2013 WL 2631733, at *20 (Fed. Cl. May 23, 2013) (agency has discretion to engage in clarifications with just one offeror); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 715 (2010); Chenega Mgmt., LLC v. United States, 96 Fed. Cl. 556, 586 (2010) (ease with which proposal could have been corrected did not render agency's decision to forgo clarifications unreasonable); cf. Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1327-29 (Fed. Cir. 2011) (declining to construe similar solicitation language as limiting contracting officer's discretion to forgo discussions when an offeror(s) failed to comply with solicitation's requirements).  Although the plaintiff is correct that, in other contexts, an agency may

---

[22] The plaintiff also relies on PHT Supply Corp., which is distinguishable because, unlike the case at bar, the agency in that case actually engaged in discussions with the offerors.  See PHT Supply Corp. v. United States, 71 Fed. Cl. 1, 8, 21-22 (2006) ("Although the duty to raise mistakes in an offeror's proposal is no longer set forth explicitly in the regulations governing negotiated procurements, that duty undoubtedly still exists. There is no question that when, as here, an agency engages in discussions with offerors, it must make those discussions 'meaningful.'").

abuse its discretion when it "unreasonably withholds from undertaking a discretionary act," <u>Appeals of Jim Smith Contracting Co.</u>, ENGBCA No. 5883, 94-2 BCA ¶ 26,879 (1994), at *19, <u>aff'd sub nom</u> <u>Jim Smith Contracting Co., v. West</u>, 61 F.3d 918 (Fed. Cir. 1995), it is also well-settled that "the mere non-exercise of discretion is not <u>per se</u> unreasonable." <u>Id.</u>[23]

In sum, DHS's decision to find ST Net's proposal "fundamentally flawed" without first seeking a clarification from ST Net and allowing it to correct and revise its proposal was lawful and reasonable.  ST Net understood from the express terms of the solicitation that it would be bound by its proposal.  The solicitation repeatedly informed offerors of the importance of providing complete and correct information in their proposals. Offerors were told that DHS would be evaluating them on "completeness," and that clarity and completeness in preparing their proposals was of the "utmost importance." Given the clear importance DHS placed on offerors carefully and properly providing the required information, the court cannot say that DHS was obligated under FAR 1.602-2(b) and 15.306(a) to seek clarifications where information was missing or wrong, or that DHS's decision to forgo clarifications was arbitrary, capricious or an abuse of discretion.

---

[23] In reaching this conclusion, the court is mindful of the fact that the FirstSource II solicitation prompted the submission of over 240 proposals from more than 140 bidders.  DHS anticipated this "significant level of competition," AR 3, and repeatedly warned offerors of the importance of submitting complete and accurate information.  In this context, DHS's decision to reject all proposals that failed to include essential price or brand name information—rather than engage in communications—is consistent with the FAR's general goal of conducting acquisitions in an efficient manner.  <u>See</u> FAR 1.102-2.

## ii.   DHS complied with the procedures outlined in solicitation ¶ E.2.9(2)

The plaintiff next argues that DHS's decision to disqualify ST Net is not supported because DHS failed to comply with ¶ E.2.9(2) of the solicitation.  Specifically, ST Net argues that DHS improperly disqualified ST Net without having made a sufficient written determination that the mistake in ST Net's pricing matrix required a significant revision or addendum.  Pl.'s Mot. 9-10; Pl.'s Reply 7-8.  Although the plaintiff acknowledges that the agency deemed the omission of price and brand/model name to be a fundamental flaw, the plaintiff complains that "[n]o explanation whatsoever exists which explains why . . . any such omission is a 'fundamental flaw' nor whether such an omission could or would require a 'significant revision' which, if made, would permit further evaluation."  Pl.'s Mot. 10.  In response, the government contends that, by its terms, ¶ E.2.9(2) did not require a discussion of each rejection decision, and that, even if it did, ST Net's proposal was fully evaluated.

The court finds that DHS adequately documented its rationale for rejecting ST Net's proposal.  Indeed, the Source Selection Decision Document provided the following rationale for disqualifying ST Net:

> The Offeror's proposed total price is * * *; however, the total evaluated price did not fully meet the requirements per the provisions outlined in Chapter E, Part 3.4, of the solicitation.  Specifically, the Offeror did not provide Brand Names and Models, or quotes, for all of the supplies/items within their Sample Delivery Order Pricing Matrix, as required by Attachment 5 of the solicitation.  This is a fundamental flaw of the proposal.

AR 597.[24]  As noted above, the solicitation made clear that offerors would be held to

exacting standards when completing their pricing matrices.  Given DHS's stated intention

to rely on—and hold offerors accountable to—the data provided in their pricing matrices,

the plaintiff's argument concerning the adequacy of DHS's documented explanation must

be rejected.  The court will not second guess what the term "fundamentally flawed"

implies: That DHS had concluded that ST Net would have needed to submit a

"significant" revision in order for its proposal to have been complete.  The conclusion

that the flaw was "fundamental" in such circumstances must be upheld.

### C.  The plaintiff's remaining contentions are not proper bases for relief

The court has considered, and deems meritless, the plaintiff's additional

contentions that (1) DHS did not conduct a proper price evaluation, and instead only

evaluated the pricing matrices based on completeness; (2) DHS created a "de facto"

competitive range that might have obligated DHS to engage in communications with ST

Net; and (3) DHS treated ST Net differently from three IDIQ winners who ST Net alleges

submitted untimely proposals or who submitted incomplete pricing matrices.  These

arguments are addressed in turn.

First, the plaintiff has failed to carry its burden to show that DHS failed to conduct

a proper price evaluation.  The plaintiff offers no evidence—let alone the "almost

irrefragable" proof necessary to overcome the presumption of regularity—that DHS

officials failed to act in good faith in evaluating offerors' price proposals.  See Galen

---

[24] Section 3.4 of the solicitation explains that the pricing matrix will be the basis for calculating
each offeror's total evaluated price.  AR 85.

Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (quoting Info. Tech. Applications Corp. v. United States, 316 F.3d 1312, 1323 n.2 (Fed. Cir. 2003)).

The plaintiff has also failed to demonstrate that DHS did, in fact, create a competitive range excluding ST Net from consideration prior to fully evaluating ST Net's proposal.  It is not disputed that DHS announced in the solicitation that it would make awards without discussions and thus without creating a competitive range.  This court has observed that a basic element of a competitive range is that "it excludes certain offerors from further consideration," Serco Inc. v. United States, 81 Fed. Cl. 463, 490 n.41 (2008), and nothing in the record suggests that ST Net's proposal was excluded from consideration up until the point when the SSA made its best value determinations, see id. at 473-74, 490 n.41 (de facto competitive range not created where agency fully evaluated 62 conforming proposals and recognized "presumptive award group" consisting of bidders falling above the "natural break" between the 27th and 28th ranked bidders).

Finally, the plaintiff has failed to show that ST Net is entitled to relief due to unequal treatment.  The record supports, and the plaintiff does not challenge, the government's assertion that none of the IDIQ winners submitted untimely proposals. During oral argument the plaintiff also raised—for the first time—the argument that DHS's award of an IDIQ contract to an offeror that had also failed to include brand name information in its pricing matrix constituted unequal treatment.  Because it was raised for the first time at oral argument, the court deems this new basis for relief to have been waived.  See Raytheon Co. v. United States, 96 Fed. Cl. 548, 555 n.2 (2011) (citing cases).  Moreover, even if the court were to consider this new argument, counsel for ST

Net conceded that, notwithstanding the alleged absence of brand/model name information, all of the IDIQ awardees provided DHS with complete price information for each item in their pricing matrices. The plaintiff's arguments related to unequal treatment must, therefore, be rejected.

## III.    CONCLUSION

For the foregoing reasons, the government's motion to dismiss under RCFC 12(b)(1) and 12(b)(6) are **DENIED**.  The government's motion for judgment on the administrative record is **GRANTED**, and the plaintiff's cross-motion is **DENIED**.[25]

Each party shall bear its own costs.  The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**


s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge

---

[25] Because the court finds that it was not arbitrary, capricious, an abuse of discretion, or contrary to law for DHS to disqualify ST Net, the court has no occasion to reach the government's alternative argument concerning this court's authority to grant the specific injunctive relief sought by the plaintiff.  Similarly, the court has no occasion to evaluate whether injunctive relief is appropriate.